H. GOLDFEDER and M. L. Lagoni,
Plaintiffs in Error,

v.

John JOHNSON and Reed Blankenship, Ad-
ministrator of the Estate of Jincy Bunnup,
Deceased, Defendants in Error.

No. 40362.

Supreme Court of Oklahoma.

May 12, 1964.

**352**

Hal Welch, Vester Songer, Hugo, and Paul D. Sullivan, Duncan, for plaintiffs in error.

Carl E. LeForce and Ed R. LeForce, by Ed R. LeForce, Idabel, for defendants in error.

BLACKBIRD, Chief Justice.

The principal issue involved in this action is whether a White man, named "Nudy White", or a full blood Indian, named "Johnson", inherited, as her surviving husband, an undivided one-half interest in the 160 acres of land allotted to a woman enrolled as a full blood member of the Choctaw Tribe of Indians, under the name of "Flora Homma", when she died, or was murdered, on December 1, 1957, at the home of one George Tishka, or Tisha, near Golden, in McCurtain County.

The marriage ceremony in which Flora and White were the principals was performed November 7, 1956, under a marriage license issued at Hugo, setting forth her address as Eagletown in McCurtain County.

Soon after Flora's death, White executed and delivered a deed, dated December 11, 1957, covering the 160 acres, to H. Goldfeder, one of the plaintiffs in error, who thereafter deeded one-half of his claimed interest to the other plaintiff in error, M. L. Lagoni.

When Goldfeder thereafter instituted this action in August, 1958, to quiet his title on the basis of his deed from White, he named Flora's mother, Jincy Bunnup, as a defendant, alleging that she inherited the other undivided one-half interest in Flora's allotted 160 acres, and sought a determination of said allottee's heirs, as well as a partition of the acreage. As there is no issue between Goldfeder and Lagoni, our use of the term "plaintiffs" will refer to both.

In December, 1958, before the case was at issue, Edward R. LeForce, who later was to become attorney for John Johnson, one of the defendants in error herein, was appointed guardian ad litem for Jincy Bunnup, and, during the same month, he filed, in that capacity, an answer denying that Flora was married to Nudy White, or to any other person, and alleging, among other things, that she left Jincy as her sole and only heir.

Thereafter, Jincy Bunnup died on March 21st, 1959, and on September 21st of the same year, her former guardian at litem, attorney LeForce, obtained leave of court, as attorney for John Johnson, for the said Johnson's intervention in the action.

Thereafter, Johnson, hereinafter referred to as "intervenor", filed in October, 1960, an answer and cross petition in which he alleged, among other things, that he had married Flora on September 6, 1952, at DeQueen, Arkansas. He attached to his petition a certified copy of a marriage license issued the same date in Sevier County, Arkansas, for the marriage of a "Mrs. Flora Sampson" of Eagletown, Oklahoma, and a "John Johnson". Intervenor further alleged that he and Flora remained husband and wife until her death, whereupon title to her land vested jointly in him and her mother, Jincy, as her sole surviving heirs. Intervenor also alleged, among other things, in substance, that any purported marriage Nudy White had entered into with Flora (while she was the wife of Intervenor) was bigamous and void, and that White's deed to Goldfeder, after her death, was consequently null and void. Intervenor's pleading prayed, among other

things, that said deed and Lagoni's be cancelled, and that Intervenor and Jincy be adjudged Flora's only heirs, and that each inherited, upon Flora's death, an undivided one-half interest in the subject land.

Thereafter, Goldfeder and/or his attorneys obtained information that the Intervenor had been previously married in McCurtain County to one Dovie Brannan, on August 20, 1927, under a marriage license naming him as "J. J. Johnson". When the Intervenor's deposition was taken in Idabel, on April 1, 1960, he stated that he and Dovie were divorced in the District Court of Choctaw County, before his claimed marriage to Flora.

Thereafter, on May 10, 1961, the day the trial commenced, Goldfeder and Lagoni, filed a pleading entitled "JOINT REPLY AND ANSWER * * *", in which they denied, among other allegations, that Johnson and Dovie Brannan were divorced by the District Court of Choctaw County.

At the May, 1961, hearing, Dovie Brannan Johnson, now Phillips, testified, among other things, in substance, that she obtained the divorce from Intervenor in the District Court of Oklahoma County (instead of in Choctaw County, at Hugo) after she had lived with him as his wife " * * * around the Choctaw Lumber Company camps, Clebert and Alikchi" in McCurtain County for about five years, had then separated from him and moved to McAlester, and had moved from there to Oklahoma City in 1933. One of the other subjects dealt with in her testimony was the service by publication obtained in that divorce action upon its named defendant "John M. Johnson", upon the filing of an affidavit for such service over the purported signature of a "Dovie Johnson" and stating, among other things, that " * * * if he (the defendant, John M. Johnson) has any place of residence * * * (same) * * would be in the City of Cooper, State of Texas." On cross-examination, Mrs. Phillips was also interrogated concerning the identity of an "M. Johnson", whose name appeared on the above-mentioned marriage certificate as a witness to her marriage to "J. J. Johnson".

Nudy White did not appear at the hearing, it being explained that he was incompetent and in a rest home. However, Mr. Goldfeder testified in his own behalf that he had obtained his deed from White before he became incompetent. This witness also testified, among other things, that at that time, and for many years previous thereto, he had been in the mercantile business at Hugo, and that, at the time of Flora's death, he was in possession of the subject 160 acres, under a five-year Indian Departmental Grazing Lease.

It was established during Goldfeder's testimony that Flora Homma had married an Oscar Sampson, at Ardmore, on December 21, 1936, and that, in a divorce action he thereafter filed in the District Court of Marshall County, Sampson had obtained a divorce from her on September 24, 1951, at which time she did not appear.

Wesley Hudson testified on behalf of the Intervenor, among other things, that he lives in a little community called Mountain Fork, about three miles from Eagletown; that he had lived in that vicinity all his life; that from 1948 to 1956, he resided across the road from Jincy Bunnup's two-room house and that Flora resided there with her mother. It may be inferred from Hudson's testimony that Jincy was aged and infirm, and that he helped care for her, especially when Flora was away from home. Hudson further testified he was living there the day Flora married Johnson and accompanied him in a taxi, with an Arkansas license on it, to Jincy's home and that she then pointed him out to the witness as the man she had just married. Hudson further testified that Flora was never a resident any place other than in McCurtain County, and "in the past twenty years" she had not lived in any other county, though he named places in other counties where she had gone for short, or temporary, stays. This witness further testified that Johnson continued to live with Flora and her mother across the road from him about two years,

and then Johnson and Flora went to Bethel (also in McCurtain County), but that Flora did not stay there because "she couldn't be away from her mother too long at a time"; that Johnson told him he worked in the "log woods" at Clebert or Alikchi Camp for the Choctaw Lumber Company; that Johnson also worked at farm labor and would go to Texas and Arizona in the Fall to pick cotton "till way up towards spring * * *". Hudson further testified that, while Johnson was living and working around Bethel, he and Flora would still meet and be together in a tourist court at Broken Bow.

Hudson further testified that he knew Nudy White, who " * * * lived with us Indians a long time", his residence being "at a place called Goodwater * * * in McCurtain County." Hudson denied that White lived at Mountain Fork with Flora, but further testified, among other things, that he had come to see her and Jincy several times, and "stayed a day", but that he never knew of his staying all night there.

At the close of the trial on May 10, 1961, the court took the case under advisement, and by order, incorporated in a so-called "JOURNAL ENTRY OF TRIAL", allowed Goldfeder and Lagoni until June 1, and Johnson, until June 20, 1961, to submit briefs.

Thereafter, on November 28, 1961, the Intervenor filed a motion to reopen the case for the introduction of further evidence. Briefly stated, the allegations set forth in the motion concerning such evidence represented, in effect, that it would prove by the records in the Court Clerk's office of said county, that Flora and the Intervenor had never been divorced in McCurtain County, and would refute any previous inference that they might have been divorced (validly) at other places. The motion also contained statements, among others, representing, in effect, that the Intervenor had not testified at the previous trial because of temporary loss of memory, resulting from a previous physical assault upon him. The motion also contained representations concerning facts to which said Intervenor

would then testify, if permitted, and explained that no verified statement of such testimony was attached to the motion because of his inability "to read or write or understand the English language to any material degree * * *".

After overruling a motion by the plaintiffs on June 5, 1962, to strike the Intervenor's above described motion to reopen, the court, on the same day, reopened the case and received further evidence. The Intervenor was not present that day, but, over the objections of plaintiffs, Wesley Hudson was called by Intervenor's counsel to testify in his stead. After plaintiffs' objections had first been sustained, Intervenor's counsel then described the facts to which the witness would testify, if permitted, and the court then announced that he would allow Hudson to testify, if he knew, why the Intervenor was not present. Hudson then testified, among other things, that during the previous October, he, accompanied by a minister, had gone to see the Intervenor where he was working on a farm in or near a McCurtain County community named Batiste, on the Glover River, and that he had also talked to, and accompanied him to court, on the day of the previous trial, and that his memory was "bad" that day. On cross examination by plaintiffs' attorney, Hudson revealed the minister's name was "Bohanon"; that he had paid Bohanon $5.00 to transport him in his automobile to the place Intervenor was farming on the above mentioned occasion. Hudson denied that attorney LeForce requested him to make that trip, but he admitted LeForce had told him he desired to contact Johnson. Hudson also revealed that he expected to be reimbursed for travel expenses he had incurred, amounting to an estimated total of $60 or $70.

Intervenor's attorney, Mr. LeForce, also testified as to the Intervenor's demeanor when he went to see him on January 1, 1962, in an effort to talk to him about the case and procure his attendance at a further or future hearing. At the close of

this witness's testimony, and some argument about the matter between the attorneys, interspersed with statements by the Judge, a Jack Short was appointed as the Intervenor's guardian ad litem. Thereupon, Mr. Goldfeder took the witness stand and testified, among other things, in substance, that he had conversed with the Intervenor at the court house (in Duncan) on the day of the former trial, and that he observed no abnormality in him. This witness also gave testimony, and evidence was introduced on plaintiffs' behalf, showing several instances between September 6, 1952, (the date of Flora's license to marry Intervenor) and November 7, 1956 (the date of her license to marry White) in which the deceased allottee had signed her name as "Flora Homma", or used the name: "Flora Homma Sampson". Wesley Hudson also testified once again, and, in his testimony he, among other things, modified and supplemented in some particulars, his previous testimony concerning the places Flora and the intervenor resided after their marriage. He did not change his former testimony, however, as to the fact that all of these places of residence were in McCurtain County. He also supplemented his previous testimony by describing in more detail, how, at her mother's request, he had remonstrated with Flora for having married Nudy White, without first being divorced from Johnson.

On the same day as the above described hearing (January 5, 1962) the Court Clerk at Duncan wrote the intervenor a letter, at the behest of the Trial Judge, informing him that the case was scheduled for "final trial" in March, 1962, and further stating:

"* * * it will be absolutely necessary for you to be here on this date.

"You will govern yourself accordingly."

Thereafter, on March 16, 1962, a deposition was taken from Dovie Phillips, in Oklahoma City. The gist of her statements in this deposition amounted to a corroboration of Goldfeder's previous testimony that there was nothing abnormal about the Intervenor when she talked to him in Duncan on the previous trial date, almost a year before.

Finally, at the last hearing of this case, on March 20, 1962, the Intervenor was present and testified. Testifying for plaintiffs was one Curtis McKee, a former beer tavern co-owner and taxi operator in Broken Bow. He testified, among other things, to having taken Flora on trips to various towns and cities in southeastern Oklahoma, and to Flora's having told him that she had lived at Antlers, Madill and Hugo. The only other witness testifying for plaintiffs that day was one Ethridge Hill, who, among other things, testified that White bought Flora the last clothes she had, and that, after her death, he took them from George Tisha's house, attended her funeral, and asked the Sheriff to investigate her death.

At all three hearings of the case, there was no conflict in the evidence establishing that the Intervenor was in Arizona when Flora died. As to when, after Flora's death, he returned to Oklahoma and McCurtain County, the evidence was not so clear.

After the close of the evidence the court entered judgment finding the issues in favor of the Intervenor Johnson, and adjudging him to be Flora Homma's surviving husband and that he—rather than Goldfeder and Lagoni—was the owner of the undivided one-half interest in the 160 acres involved herein. Upon the overruling of their motion for a new trial, plaintiffs perfected the present appeal.

Plaintiffs' arguments for reversal are presented in their brief under five "Points". They will be dealt with in reverse order.

Their argument under their "Point 5" is in substance, that the trial court erred in overruling their motion to strike the Intervenor's motion to reopen the case, and thereafter proceeding to allow him to introduce additional evidence (as hereinbefore shown to have been done on January 5, 1962) though he had been present in court previously (when both sides

of the case rested) but did not testify, and did not appear on the latter date, and made no explanation of his failure to previously testify, until his inability to do so was first injected into the case several months after the court had concluded, as recited in the hereinbefore mentioned "Journal Entry Of Trial" of May 10, 1961, that " * * * all of the evidence upon the issue before the court which the parties desired to present has been offered * * *", and the case had been submitted on briefs.

Though in their argument under "Point 5", plaintiffs make statements about various and sundry other matters—as far as we can ascertain, their only complaint in any way related to any conceivable prejudice to them from the reopening of the case, and the trial judge's procuring of the intervenor's appearance in court at its last hearing by causing the Court Clerk to write the hereinbefore quoted letter, is that it resulted in the intervenor's finally giving testimony on his own behalf. They argue that if he had not testified, it would have been "necessarily encumbent" on the trial judge to have presumed from his silence that the facts, about which he could have testified, would have been adverse to his interests. We find no merit in this argument. Justice is usually more certainly served by deciding cases on evidence (if available) than by indulging presumptions. But, be that as it may, the Court Clerk's letter constituted no more than a notice to the Intervenor of the scheduling of further trial proceedings in the case, and an attempt to impress him with the necessity of his being there. Such an attempt is easily understandable in view of the statement his attorney, Mr. LeForce, had made at the previous hearing on January 5, 1962, explaining to the Court why his client was absent that day, and describing a contact he had had with him. If the Court's action could be correctly termed "advocacy", as plaintiffs' counsel characterize it, then it is so closely akin to "due process" that it should not be criticized, nor the judgment reversed on account thereof. Furthermore, much of the testimony Intervenor gave when he finally testified on March 20, 1962, was cumulative, and it is not claimed there was any element of surprise in it, or that it was any different from what should have been reasonably anticipated. We have concluded that plaintiffs have not made the necessary showing of prejudice to render the trial court's reopening of the case, an abuse of discretion, or his procuring of the writing of the Court Clerk's letter to the Intervenor, reversible error.

As plaintiffs' points numbered 2, 3 and 4 all appear, when analyzed, to deal with the general subject of the evidence's claimed insufficiency to support the finding (inherent in the trial court's judgment) that the Intervenor, Johnson—rather than White—was the man to whom Flora was legally married at the time of her death, and repeated reference is made to some of the same circumstances to support arguments under all of these points, all of said arguments will be dealt with together.

Points numbered 2 and 3 focus attention on Flora's marriage to White. Under them, it is argued that in view of the legal presumption in favor of that marriage (Flora's last proven one) and the burden the law places on a party asserting such a marriage's invalidity, to prove same, the Intervenor's evidence in this case was not sufficient to discharge that burden. In the words of their quotation from Hill v. Jones, 180 Okl. 330, 69 P.2d 324, the rule requires such a party "throughout and in every particular plainly to make" the marriage's invalidity appear, and it should "a fortiori find lodgement * * *" in cases where the parties to the marriage relations are all full blood Indians. Of course in the marriage plaintiffs rely upon, the man (White) is not an Indian, but we will assume, for the purpose of dealing with plaintiffs' argument, that said presumption applies, though we may not agree with plaintiffs' counsel as to the effect, or result, of its application.

Plaintiffs recognize that this presumption is rebuttable, but they argue that the evi-

dence in this case, with its claimed faults and shortcomings, is not sufficient to rebut it.

They concede that the "J. J. Johnson" named in the certificate of Dovie's 1927 marriage is one and the same person as the Intervenor, but they take the position that the 1933 Oklahoma County divorce decree was not sufficient proof of the dissolution of that marriage. Among the evidence and the circumstances cited in support of this position is testimony Wesley Hudson gave to the effect that (during his long acquaintance with him) the witness had always known the intervenor by the given name of "John" and had never known of his going by any other name, with the exception of "J. J."—as contrasted with the hereinbefore mentioned evidence indicating that the defendant in the Oklahoma County divorce action was a "John M. Johnson", represented in the hereinbefore quoted publication affidavit to have resided at Cooper, Texas. In our opinion, any inference from such evidence that Intervenor, Johnson (who, according to witnesses, had never been a resident of any jurisdiction except McCurtain County, Oklahoma) was not the Johnson who was the defendant in the divorce action was sufficiently countered, or dispelled, by Dovie, who positively identified Intervenor as having been the defendant in that case and who further testified that she learned, from his mother that his middle name was "May" but that he "adopted" the middle initial "J" because "May" is a girl's name and he was ashamed of, and didn't like, it. Plaintiffs seek to show, by argument and citation of authorities, that if the Intervenor had changed his name from "John May", or had *legally* adopted the name of "John J." or "J. J.", the divorce decree Dovie obtained against "John M. Johnson" was ineffective to dissolve his marriage to her. The evidence, however, is insufficient to show that "John M." was not the Intervenor's true and legal name at the time of the divorce proceedings; and his social security card issued sometime thereafter is strong evidence

to the contrary. When interrogated concerning the hereinbefore described Affidavit To Obtain Service By Publication, Dovie apparently subscribed to in that divorce action, and which was filed therein during August of 1933, she testified, in substance, that said method of obtaining service on Johnson was used " * * * because we couldn't find him * * * ". She further testified in part, as follows:

"Q. Now, Mrs. Phillips, back in 1933 when you get a divorce from John M. Johnson in Oklahoma City, your attorney, Mr. Ralph J. May, according to the records in the case mailed him a notice at Cooper, Texas. Now, can you tell us who told your attorney to mail these things to Mr. Johnson at Cooper, Texas?

"A. Well, at that time—well I'll say back before that, when we were living together, we went over in Texas and picked cotton, so I knew that if he was over there picking cotton, that would be most likely—should I say, his mailing address in case he was over there. Now, I was only guessing.

"Q. You thought he was more apt to be in Cooper, Texas, than he would down in McCurtain County, Oklahoma, where he had lived all of his life?

"A. No, not necessarily. I knew that if it was the time of year that he had gone to pick cotton, after he couldn't be found at Clebert at his former address, or his regular address, I knew then he would be likely to be in Texas if he was picking cotton. That was just a guess on my part at the time.

"Q. So it was at your instigation that the notices were mailed to Cooper, Texas? * * *

"A. Yes, because I guess no one else would have known but me that that was where he might be.

"Q. That's right. Now, what time does the cotton season of picking usually start?

"A. Oh, my. I think that would be according to the weather and the planting and—

"Q. Well, what would be the earliest cotton picking time in that section of the country?

\* \* \* \* \* \*

"A. Mister, I haven't been on a farm for thirty years and I just don't remember all those kind of things that long ago. I would say anywhere from October on, Oklahoma picks cotton, and Texas, I think, usually starts about the same time, \* \* \*".

Dovie's above quoted testimony is in accord with that of the Intervenor, and with the evidence generally, that there had been years, during the cotton picking season, in which he had worked in Texas, and in the vicinity of Cooper. This, apparently was before his brother moved to Arizona and he ever made a trip there. Consequently, what plaintiffs speak of as his "long continued" residence in Arizona is no indication whatsoever that he was not the same person as the named defendant in Dovie's divorce action.

After examining Dovie's testimony, we do not regard as tending to impeach her (as plaintiffs' counsel suggest) the circumstances that she executed the publication affidavit during the month of August, whereas, on the basis of her own testimony, this would have been two months prior to the beginning (to the best of her memory or knowledge) of the cotton picking season. Nor do we consider, as seriously reflecting upon her credibility, the fact that during her testimony, she contradicted herself, concerning the "M. Johnson" who witnessed her marriage to the Intervenor, and finally stated that she didn't remember whether that was his brother Marion Johnson, or a neighbor by the name of "Johnson".

Plaintiffs also point to the fact that the Intervenor did not (initially) "rely" (to use their term) on the Oklahoma County decree (to remove his marriage to Dovie as an impediment to his marriage to Flora) but stated in his deposition, that his marriage to Dovie ended by a divorce she was granted in Choctaw County. At the trial, the Intervenor explained that he so deposed in reliance upon what his sister-in-law in Arizona had told him. While that part of the Intervenor's deposition was indicated to be hearsay, as were parts of his and Wesley Hudson's testimony, plaintiffs fail to point out how Intervenor's initial failure to "rely" on the Oklahoma County decree renders it any less effective as a dissolution of his marriage to Dovie. The fact remains that, according to the overwhelming weight of the evidence, that decree related to that marriage, and we think the above is a sufficient answer to all of the questions formulated in plaintiffs' brief concerning that divorce action.

With reference to their claim that the evidence was insufficient to overcome the presumption of the validity of Flora's marriage to White for the further reason that it did not establish that Flora and the Intervenor had ever been divorced, plaintiffs take the position that, according to the evidence, Flora and the Intervenor resided separately in jurisdictions outside McCurtain County, and therefore proof that the Court Clerk's records in that County revealed no filing of any divorce action between them there, did not discharge Intervenor's burden of proof as to that necessary element. They again point to the Intervenor's testimony that, at the time of the trial, his brother had lived at Coolidge, Arizona, for 15 years, and that during at least some of those years, said witness had left McCurtain County and had gone to Coolidge and worked in that vicinity during winter harvest seasons and to the undisputed fact that he was there at the time of Flora's death. Plaintiffs' argument seeks to cast doubt upon the veracity of the intervenor, and other witnesses, who

gave testimony from which it could be inferred that these absences from McCurtain County were only temporary. They say:

"The true state of the record is that the first time it can be determined with any reasonable degree of certainty that John Johnson was actually present in the State of Oklahoma, subsequent to the death of Flora Homma, was the * * *" occasion that "* * * his deposition was taken in Idabel on April 1, 1960."

Thereafter they say:

"We respectfully submit that in view of the admitted *long period of residence* by John Johnson in the State of Arizona it was wholly insufficient to simply show that he had never obtained a divorce from Flora Homma in McCurtain County, Oklahoma." (Emphasis ours).

Despite the above-quoted representations, the evidence does not show that the Intervenor, Johnson, was in Arizona continuously more than three months at a time, or in any one year. It was plaintiffs' counsel who elicited from Johnson that one of his return trips from Arizona to McCurtain County occurred as early—after Flora's death—as January, 1960, for which trip he used a bus ticket forwarded to him by one Leonard Bowen. Part of the Intervenor's testimony, if examined out of context, might be interpreted as indicating that the first time he returned from Arizona to McCurtain County after Flora's death (in December, 1957) was shortly before he (through Attorney LeForce) sought permission (as hereinbefore shown) for his intervention in this case on September 21, 1959. After examining this witness' testimony as a whole, however, and viewing it in the light of other circumstances shown by the record, we think it may be reasonably concluded that the first time Johnson returned from Arizona to McCurtain County—after Flora's death—was in late 1957, or early 1958, and. that he worked another winter season in that State, after Goldfeder filed this action in August, 1958, before again returning to

Bethel· in said County, and engaging Mr. LeForce to assist him in being made a party to, and contesting plaintiffs' position in this action. If such were the facts, and Johnson did not contact Attorney LeForce, and LeForce was not apprised of Johnson's relationship with Flora, until sometime in 1959, it is not an unusual or significant circumstance (as plaintiffs counsel attempt to make it appear) that said Attorney filed the kind of an answer he did, as Jincy Bunnup's Guardian on December 18, 1958 (denying that Flora was married *to anyone* at the time of her death).

Nor do we think any particular significance can be attached to the fact that it was White—rather than the Intervenor—who went to Tisha's home, after Flora's death, to claim her clothing, and who tried to instigate an investigation of her death. As already noted, the Intervenor was not in Oklahoma at that time, and it appears that he did not learn of Flora's death until some time later. Nor do we consider of primary significance, or importance, the instances in which Flora was shown to have used, and signed, the name "Flora Homma" after she married the Intervenor and legally became "Mrs. John M. Johnson". Those who have dealt with restricted, or full blood members of the Five Civilized Tribes of Indians, whose business affairs are handled, at least partially through the U. S. Indian Service, learn that such Indians—apparently because they become accustomed, in their contacts with that government department, to using the names in which they appear in that department's records and the tribal rolls—often use those same names more or less generally, and in their contacts with others, especially in matters pertaining to restricted property or money, which that Department supervises for them as wards of the Government of the United States.

We cannot say that any of the evidence referred to above, including what plaintiffs refer to as the Intervenor's "perjured", deposed statement that his divorce from Dovie. occurred in Choctaw County, renders unworthy of belief or consideration, his posi-

tive testimony that he was never divorced from Flora at the suit of either of them (anywhere). We have demonstrated in Hawkins v. Oklahoma Scrap Paper Co., (Okl.) 389 P.2d 513, and other cases, that conflicting statements of an interested witness about matters of less importance do not necessarily impeach his or her testimony as to the decisive facts about a marital relationship. Nor do we consider the testimony of the tavern and taxi operator, Curtis McKee (hereinbefore referred to) of sufficient weight and probative value to be of material assistance in plaintiffs' attempt to show the trial court's judgment to be clearly against the weight of the evidence. The full text of that witness' testimony referred to in plaintiffs' arguments is as follows:

"Q. * * *, did you know Flora Homma?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. Well, when I first opened up —I'd haul her around in the taxi and she'd come in there and drink beer.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Will you tell the court the nature of the drives you made for her and the circumstances? I am talking about prior to this marriage to Nudy White?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. Well, I took her to Antlers; I've took her to Hugo, and I've took her up here to Madill, this side of Madill.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. That would be in a period of a year and a half to two years?

"A. Almost two years.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. During any of those periods or those drives, or trips, did she make any expression to you about where she was then living?

"A. No, she didn't. *She just told me so many different places, I didn't know.*

"Q. Well, now, what do you mean by that?

"A. Well, I'd ask her and *one time she'd tell me one place and the next place, another time.*

"Q. Well, what places did she tell you she lived at?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. She told me she lived at Antlers and she's told me she lived up here at Madill and in Hugo, too.

&ast; &ast; &ast; &ast; &ast; &ast;."

(Emphasis ours).

While it may be that at some time after Flora married Oscar Sampson at Ardmore, in 1936, and before he divorced her at Madill in 1951, she resided in Madill, there is nothing in the record to indicate this unless that may be inferred from the above quoted testimony and the granting of the divorce there. The representation in plaintiffs' brief to the effect that the Intervenor made no effort to prove that Flora did not obtain a divorce from the Intervenor in any of the several counties in which "she claimed a residence", is misleading. Other than the above quoted hearsay-like statement of Curtis McKee, there is no evidence in the record that Flora claimed residence in any county other than McCurtain for twenty years before the trial in 1962. In fact, plaintiffs own witness, Goldfeder, testified he had personal knowledge that her address was at Eagletown for that period.

Treating the trial court's judgment as a finding of every fact necessary to support it, there inhered in it the finding that neither Flora nor the Intervenor, Johnson, resided, or acquired a residence, anywhere except in McCurtain County, at any time after their marriage; and such a finding, or conclusion, is amply supported by the competent testimony of more than one witness, whose credibility the trial judge was in a better position to determine than are we. We cannot say that Wesley Hudson's testimony was unworthy of consideration as support for the judgment, because he was an "interested witness" (as characterized by plaintiffs). Though, as hereinbefore shown,

Hudson indicated in his testimony that he expected to be reimbursed for the $60 or $70 he had expended on the Intervenor's behalf, there is no evidence that he had any direct, or pecuniary, interest in its outcome. He did reveal that he had testified at Idabel, in a probate hearing involving Jincy Bunnup's estate, and that he was interested in seeing that funds were derived from hers and/or Flora's interest to purchase headstones for their graves. We do not think, however, that such an "interest" is sufficient ground for excluding Hudson's testimony from consideration in determining the judgment's evidentiary support.

In connection with calling our attention to the fact that until its amendment in 1961, Title 12 O.S.1951 § 1272, did not specify any period of time that a party had to reside in a particular county before filing a divorce action there, plaintiffs take the position that the Intervenor, in order to discharge his burden of proving that he and Flora had never been divorced prior to her participation in the marriage ceremony with White, was required, in addition to the proof from McCurtain County, to also have shown, by court records, that no such divorce was ever granted in this State's Marshall, Choctaw and Pushmataba Counties, or in Arizona's Pinal County (in which Coolidge is located) and also its adjoining County of Maricopa. They base their position on the claim that Josephine Brokeshoulder assumed a similar burden of proof in Brokeshoulder v. Brokeshoulder, 84 Okl. 249, 204 P. 284, 34 A.L.R. 441. In our opinion, plaintiffs' position is untenable in view of the ample support, hereinbefore referred to, for the conclusion that neither Flora, nor the Intervenor, ever acquired a residence outside of McCurtain County, Oklahoma, after their marriage, and the Intervenor's positive and uncontradicted testimony that they were never divorced. We cannot say that the trial court's judgment lacks sufficient evidentiary support, without the court records plaintiffs refer to.

As we have found no sound reason in plaintiffs' argument for reversing the judgment herein appealed from, the same is hereby affirmed.

HALLEY, V. C. J., and DAVISON, JOHNSON, WILLIAMS, JACKSON, IRWIN and BERRY, JJ., concur.